**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL GOZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:17-cv-2873-JPM-dkv |
| v. | ) | |
| | ) | |
| MEMPHIS LIGHT, GAS AND WATER | ) | |
| DIVISION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION**
**AND**
**ORDER DENYING LEAVE TO AMEND PLEADINGS TO CONFORM WITH THE**
**EVIDENCE**

This matter came before the Court for a nonjury trial from February 25 to February 27,

2019.  (ECF Nos. 99-101; <u>see</u> O. Granting Mot. Strike, ECF No. 91.)  Plaintiff Michael Goza

alleges that Defendant Memphis Light, Gas and Water Division ("MLGW" or the "Division")

discriminated against him on the basis of his protected speech and on the basis of his race when

it demoted and terminated him in October, 2017.  (Pretrial O., ECF No. 98 at PageID 1491.)

For the reasons set forth below, the Court finds that Goza succeeds on both claims.

The government does not have to turn a blind eye to the speech of its employees, but

MLGW's decisions in this case were based on unconstitutional factors.  As the Court explains

below, the proof at trial showed that MLGW did not actually believe that Goza would hurt

customers or treat anyone unfairly on account of their race.  Instead, the Court finds that MLGW

fired Goza because he expressed unpopular opinions and created a perception problem for the Division.

Public perception alone cannot justify a restriction on free speech – the First Amendment, after all, restricts the government even though the government is chosen by the people. See Don Herzog, The Kerr Principle, State Action, and Legal Rights, 105 Mich. L. Rev. 1 (2006) ("Ordinarily, the state should do what citizens want… But sometimes the law bars that responsiveness."). Some of Goza's statements may have been insensitive, offensive, and even bigoted, but they were protected by the Constitution nonetheless. MLGW thus violated Goza's First Amendment rights when it demoted and fired him.

The Court also finds that MLGW terminated Goza in part because of his race. MLGW decisionmakers explicitly mentioned Goza's race as a reason for his termination. MLGW also acted differently in the case of Deandre Stewart, a similarly situated African-American employee, who received only a three-day suspension after he advocated killing Asian-Americans because of their race. MLGW then took the unusual step of directing a subordinate to write a report with the implicit goal of exonerating Stewart and downplaying his remarks. The Court finds this to be an affirmative attempt to undermine the even-handed application of MLGW policy. The Court considers this to be particularly strong evidence that MLGW's policies as applied to Goza were a pretext for discrimination.

I.      Background

Michael Goza worked as a Customer Service Tech III (a "Tech III") for MLGW, a division of the City of Memphis and the utility provider for electricity, gas, and water service for Memphis and Shelby County. (Pl.'s Resp. Def.'s Statement of Material Facts, ECF 45-1 at

585-86.)  Goza's responsibilities included investigating and repairing problems with utility services in customers' homes.  (Id. at 586.)  Over thirty-two years of employment, Goza received customer compliments and good reviews but no customer complaints.  (Def.'s Resp. Pl.'s Statement of Material Facts, ECF No. 48-1 at 803-804.)

On August 15, 2017, protesters gathered to support the removal of a statue of Jefferson Davis from a public park in Memphis.  (Trial Exhibits 6, 7.)  Goza did not have work that day and attended the rally to voice his opposition to the removal efforts.  (Id.; Testimony of Michael Goza, ECF No. 115 at PageID 2149.)  Footage of Goza appeared on the nightly news and some statements he made at the protest were reported in *The Commercial Appeal* the next day.  (Trial Exhibits 6, 7.)  *The Commercial Appeal* quoted Goza as saying, "What I'm tired of is being portrayed as KKK or a white supremacist simply because I'm a white guy who wants to preserve my heritage."  (Trial Exhibit 7.)

On Facebook, Goza had made the following statements before the August 15, 2017 rally:

Lincoln himself wanted to send all of you back to Africa. Segregation? That's a whole other topic. What has it accomplished other than to cause more division between the whites and blacks. You want to be with your kind. I want to be with mine.  Blacks make up 13% of the population, but yet are responsible for almost 80% of violent crime. Every city that's a third world crap whole [sic] is a majority black and ran by blacks. I could not agree more about what the federal government has done to blacks however. They're my enemy. I look at them as an enemy of Christianity. Planned Parenthood is defended by democrats mostly, but yet has murdered more blacks than all violent crime combined. I agree on the war on drugs. Its been used as an excuse to destroy our liberty while the government ships the drugs into our country and profits from it. Why else do you think that Heroin is epidemic while our troops guard the poppy fields in Afghanistan? So we may not agree on the South, but we can sure agree on the criminality of the federal government.

(Trial Exhibit 2.)

> You want to be with your kind. I want to be with mine, There's no wrong it that. You celebrate your history, but you want to destroy mine. You have black history month, but being proud of white history is racist. That's the hypocrisy I will never be at peace with. I work the streets of Memphis daily. The real racists are blacks. 90% of the blacks who are murdered are done so at the hands of other blacks. So if black lives matter, why don't you clean up your own damn house before complaining about my history and blaming your problems on whitey.

(Id.) When an individual on Facebook stated, "Signing won't do shit. Until Southern supporters get to the streets and riot like the ones pushing for removal. Eye for an[] eye," Goza replied:

> I couldn't agree more. We at the League of the South are doing much more. We are getting in the streets. New Orleans was only a beginning. Charlottesville is this weekend and over a thousand [are] planning on going. We're planning these all over South. The attacks have awakened more and more.

(Id.)

Goza's appearance at the rally attracted the attention of individuals who began to investigate Goza's social media activity. (See generally Trial Exhibit 5.) At some point, these persons learned that Goza worked for MLGW, perhaps because other MLGW employees told them or perhaps because one of Goza's Facebook pictures shows him in an MLGW truck. (See Trial Exhibit 2, Trial Exhibit 5.) One complaint about Goza's employment was shared twenty-one times on Facebook. (Trial Exhibit 5.) Stacey Greenberg, MLGW Community Relations Coordinator, testified that another post had been shared eighty-one times, although she was unable to produce documentation supporting her assertion at trial. (See Testimony of Stacey Greenberg, ECF No. 116 at PageID 2217.) Ten customers submitted complaints to MLGW about Goza, but MLGW received no complaints after August 29, 2017. (Id. at PageID 2224.)

Goza's appearance at the rally and his social media statements came to MLGW's attention as early as August 17, 2017. (Trial Exhibit 1.) Richard Thompson, an MLGW Senior Communications Specialist, wrote in an August 17 email to Gale Carson, Vice President of Communications, that "There is a vibrant movement to 'out' employees who are posting racist

memes, etc. on social media. Stacey [Greenberg] and I have encountered posts from folks who come to our FB page to inform us because these employees self-identify themselves on FB. This hasn't turned into a story yet but it's only a matter of time." (Id.) On August 18, Carson forwarded this email and the Facebook picture of Goza in an MLGW truck to: MLGW CEO and President Jerry Collins, MLGW General Counsel and Vice President Cheryl Patterson, Vice President of Customer Services Christopher Bieber, Vice President of Construction and Maintenance Nicholas Newman, and Vice President of Human Resources Von Goodloe. (Trial Exhibit 43.) Collins directed Goodloe to conduct a human resources investigation, and Goodloe in turn delegated this task to Virginia Leonard, the Acting Manager of Employment Services. (Trial Exhibit 1; Testimony of Virginia Leonard, ECF No. 114 at PageID 1670.) Leonard began her investigation on August 18, 2017. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1677.)

Goza resumed work on August 17, 2017, two days after the Jefferson Davis protest, and worked without incident until August 21, 2017, when MLGW suspended him. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1758; Pretrial O., ECF No. 98 at PageID 1506.) By August 21, MLGW had decided that Goza would be moved to a position in which he would not have any potential contact with customers, despite, at that time, being unable to articulate an MLGW policy that Goza had violated. (See Pl.'s Resp. Def.'s Statement of Material Facts, ECF 45-1 at 585-86; see also Testimony of Virginia Leonard, ECF No. 114 at PageID 1692; and see Emails, Trial Exhibit 31 (offering Collins's opinion that Goza should be removed from all customer contact).) On September 8, 2017, MLGW offered Goza the choice of working as a Material Handler or being terminated. (Pretrial O., ECF No. 98 at PageID 1506.) The Material Handler position had a twenty-two percent lower hourly pay rate than Goza's Tech III position

and offered far less potential for overtime pay. (Id.) Under MLGW's offer, Goza would be forever unable to bid for any position that had any potential for customer contact. (Id.) At trial, Goza testified that, after accounting for lost overtime, the demotion would constitute a fifty percent pay cut. (Testimony of Michael Goza, ECF No. 116 at PageID 2165.) Goza refused the Material Handler position on September 22, 2017 and was terminated on October 3, 2017. (Pretrial O., ECF No. 98 at PageID 1506.)

Goza filed this lawsuit on December 1, 2017. (Complaint, ECF No. 1.) He alleges that MLGW violated his right to free speech when it took disciplinary action against him. (Id. at PageID 5-6.) Goza also claims that MLGW fired him because he is white. (Id.) Goza pursues these claims under 42 U.S.C. §§ 1981 and 1983, which allow individuals to sue government actors for violations of civil rights. (Complaint, ECF No. 1.) Goza asks for reinstatement as a Customer Service Tech III, for backpay and lost benefits, and for compensatory damages. (Id. at PageID 6-7; Pl.'s Post-Trial Mem., ECF No. 107 at PageID 1579-80.)

## II.  Finality of Determination

### A.  Substantive Law

Before analyzing the merits of Goza's claim, the Court considers the threshold question of whether MLGW can be held liable in this case at all. A municipal defendant "cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Instead, a municipality is liable under § 1983 "only if a custom, policy, or practice attributable to the municipality was the moving force behind the violation of the plaintiff's constitutional rights." Gohl v. Livonia Pub. Sch. Sch. Dist., 836 F.3d 672, 685 (6th

Cir. 2016), cert. denied, No. 16-1001, 2017 WL 635927 (U.S. Oct. 2, 2017) (quoting Heyerman v. Cty. of Calhoun, 680 F.3d 642, 648 (6th Cir. 2012)) (internal quotation marks omitted).

"[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" Paige v. Coyner, 614 F.3d 273, 284 (6th Cir. 2010) (quoting Monell, 436 U.S. at 694 and citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). The Sixth Circuit has held that:

> A municipality can also be held liable for a single decision by a policymaker if the official is the one who has the final authority to establish municipal policy with respect to the action ordered. Similarly, a municipality can be liable for a decision made by a subordinate if the decision was ratified by a final policymaker. However, mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification.

Arnold v. City of Columbus, 515 F. App'x 524, 538 (6th Cir. 2013) (internal citations and quotation marks omitted) (quoting Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993)). "Whether an official has final policy making authority is a question of state and local law." O'Brien v. City of Grand Rapids, 23 F.3d 990, 1001 (6th Cir. 1994).

## B. Discussion

As a division of the City of Memphis, MLGW is a municipal defendant and may therefore be liable in this case only if its actions were the result of a custom, policy, or practice. Monell, 436 U.S. at 691. (Pl.'s Resp. Def.'s Statement of Material Facts, ECF 45-1 at 585-86.) MLGW argues that no custom, policy, or practice caused Goza's termination in this case. (ECF No. 112 at PageID 1595-96.) MLGW further claims that even if the decisions at issue in this case were "made or supported" by MLGW President Collins and Vice President of Human Resources Goodloe, they are not attributable to MLGW itself as a government entity. (Id. at PageID 1599.)

1.  MLGW CEO and President Collins had the power to discipline employees

MLGW claims that its policies do not allow Collins or Goodloe to make final and unreviewable employment decisions. (ECF No. 112 at PageID 1599.) See Arnold, 515 F. App'x at 538. Instead, MLGW argues that the Board of Directors "with the powers granted to it by the City Charter" established a grievance resolution process as part of a Memorandum of Understanding between MLGW and its labor union. (ECF No. 112 at PageID 1599.) MLGW claims that in doing so "the Board created a custom" under which MLGW's employment decisions would not be final until the conclusion of this grievance process. (Id.)

"A federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988). To determine whether the law delegates final and unreviewable authority to Collins, the Court considers the City Charter and the Memorandum of Understanding. The Court need not consider testimony regarding MLGW employees' understanding of who the final decisionmaker is. See Id. ("[A] a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it. And certainly there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself.") (See ECF No. 112 at PageID 1597, 1599.)

The Article of the City Charter that establishes MLGW also charges the MLGW President, "subject to the regulations of the board of Light, Gas and Water Commissioners," with the duty of "general supervision over the operation of said light, gas and water division

and of all officers and employees of said light, gas and water division."  Memphis City Charter, Part I, Art. 65, § 672.  The Charter also requires that "the powers hereby granted," including the powers granted to the President, "be liberally construed to effectuate the purposes hereof."  Id. at § 699. "Liberally construed," the President's power of general supervision over employees includes the authority to make final disciplinary decisions.  See id. at § 672, 699.  Although the President is required to make regular reports to the Board of Commissioners, the City Charter does not require that the Board ratify, review or approve individual operational decisions.  Id. at § 672.  The City Charter empowers the President to make municipal policy related to employee supervision and discipline.  See Feliciano, 988 F.2d at 655; Pusey v. City of Youngstown, 11 F.3d 652, 659 (6th Cir.1993).

MLGW argues that the President's powers as set out by the Charter are subject to the Board's "exclusive authority to engage, determine the number of, and fix the duties and salaries of all employees."  (Mem. of Understanding, Trial Exhibit 48 at 4.)  MLGW claims that the Board exercised this authority when it entered into the Memorandum of Understanding with its labor union.  (ECF No. 112 at PageID 1599.)  MLGW contends that Collin's decisions are not municipal policy, because under the Memorandum the President's decisions are subject to review through a grievance resolution process.  (Id.)

MLGW asks the Court to apply the Supreme Court's reasoning in Praprotnik, 485 U.S. at 126, as the Court considers the issue of final policymaking authority.  (ECF No. 112 at PageID 1597.)  In Praprotnik, the Supreme Court found that St. Louis's City Charter established a Civil Service Commission "[t]o consider and determine" employment matters upon reference or appeal.  485 U.S. at 129.  The Charter provision relied on by the Supreme Court stated that the Civil Service Commission had the power:

9

> To consider and determine any matter involved in the administration and enforcement of this [Civil Service] article and the rules and ordinances adopted in accordance therewith that may be referred to it for decision by the director [of personnel], or on appeal by any appointing authority, employee, or taxpayer of the city, from any act of the director or of any appointing authority. The decision of the commission in all such matters shall be final, subject, however, to any right of action under any law of the state or of the United States.

Praprotnik, 485 U.S. at 129 (insertions in original) (quoting St. Louis City Charter, Art. XVIII, § 7(d) (1988)). The Supreme Court concluded that the plaintiff had not been terminated through operation of an official policy, because, in light of the Civil Service Commission's powers, the City Charter did not empower his immediate supervisor or his department head to make final decisions. Praprotnik, 485 U.S. at 129.

The Memorandum of Understanding's grievance resolution process differs significantly from the St. Louis City Charter reviewed in Praprotnik and from the review boards examined in other cases. Praprotnik, 485 U.S. at 129; see Meyers v. City of Cincinnati, 14 F.3d 1115, 1118 (6th Cir. 1994) (discussing powers of the Civil Service Commission established under Ohio law). In this case, the Memorandum does not empower any person or entity to "consider and determine" issues. See Praprotnik, 485 U.S. at 129. To the contrary, the express goal of the Memorandum's grievance procedure is "to reach an understanding" and to ensure that "grievances [are] settled in an orderly, prompt and equitable manner." (Mem. of Understanding, Exhibit 43 at 35.)

The Memorandum of Understanding's grievance process is thus not an appeal nor a determination, but rather a mechanism for facilitating settlement between the labor union and MLGW. (Mem. of Understanding, Exhibit 43 at 4.) Step 1 of the grievance process is an "oral discussion" between the employee and his supervisor "to encourage a cooperative and direct resolution of differences." (Id. at 36.) The employee's supervisor is required to give an oral

answer at Step 1, but any resolution at this phase is a "settlement" rather than a determination or a finding. (Id.) At Step 2, the employee provides a written grievance and then has a "meeting" with his Department Head and other members of management "in an effort to settle the grievance." (Id.) The Department Head is required to issue a "written decision" after the meeting, but this document is a "settlement" or an "answer" rather than an MLGW determination. (Id.)

Step 3 allows for a discretionary referral of unresolved grievances to the Manager of Labor and Employee Relations. (Mem. of Understanding, Trial Exhibit 48 at 36.) After this referral, the employee, the Manager of Labor and Employee Relations, and the Union Business Manager meet "for the purpose of adjusting the grievance to the satisfaction of the parties." (Id. at 36.) Witnesses may be called during Step 3 for a "hearing phase" during which the goal remains "to resolve the grievance" rather than to make any factual determinations or review previous decisions. (Id. at 37.) If no settlement is reached, the Manager (or Assistant Manager) of Labor and Employee Relations and the Union Business Manager are to convene and make "every effort" "to review the facts objectively and to dispose of the grievance. Any agreement reached will be the final disposition of the grievance." (Id.) The emphasis remains on negotiation rather than determination. Compare with Praprotnik, 485 U.S. at 129 (discussing the power "to consider and determine" issues). MLGW is required to provide "an answer in writing to the Union" but is not otherwise called upon to make a determination or decision. (Mem. of Understanding, Exhibit 43 at 37.)

Step 4 provides for arbitration, at which the arbitrator will hear evidence and provide a written decision. (Id.) The Memorandum of Understanding limits the arbitrator's jurisdiction, however, to issues involving working conditions and the "interpretation, application or

performance of specific provisions of this Memorandum of Understanding." (Id. at 38.) The outside arbitrator is not empowered to decide what MLGW's decision is, but rather to determine whether MLGW's final decision complies with the terms of the Memorandum. (Id.)

This case does not resemble Praprotnik or Meyers because the Memorandum of Understanding establishes no mechanism for determining issues.[1] Praprotnik, 485 U.S. at 129; Meyers, 14 F.3d at 1118. Instead, the Memorandum creates an environment for settlement and negotiation. (See Mem. of Understanding, Exhibit 43 at 4, 35-38.) The creation of a settlement negotiation process does not affect the finality of the underlying decisions under Praprotnik. 485 U.S. at 129. The City of St. Louis could have always offered to rehire the plaintiff as part of a settlement agreement, but that does not affect the finality of the termination decision. See id. The Memorandum of Understanding's grievance settlement process does not limit the power of the MLGW President/CEO to make final and unreviewable employment determinations as set out by the Charter. Collins's decisions as to individual disciplinary issues are therefore MLGW policy.

### 2. Collins ratified the disciplinary decision in this case

MLGW also argues that, even if MLGW policy allowed Collins to make final employment decisions or to ratify the employment decisions of subordinates, no such decision or ratification occurred in this case. (ECF No. 112 at PageID 1599.) MLGW further contends that "Mr. Collins and Mr. Goodloe merely acquiesced to decisions rendered by Ms. Leonard, and per Supreme Court precedent, mere acquiescence [is] not sufficient to show ratification."

---

[1] In a separate section governing discharge, the Memorandum of Understanding states that a discharged employee may be reinstated if the "discharge is found to be wholly unjustified." (Exhibit 43 at 18.) Notably, the grievance resolution procedure does not allow for such a finding to be made at any stage. (Id. at 35-38.)

(Id.)  See Praprotnik, 485 U.S. at 130.  "Ratification… requires affirmative approval of a particular decision made by a subordinate."  Feliciano v. City of Cleveland, 988 F.2d 649, 656 (6th Cir. 1993).

Virginia Leonard, the Acting Manager of Employment Services and MLGW's investigator in this case, testified at trial that she alone made the decision to demote Goza to the Material Handler position.  (Testimony of Virginia Leonard, ECF No. 114 at PageID 1719, 1800-01.)  After considering Leonard's  prior statements, the Court did not find Leonard's testimony on this point to be credible.  (See id.)  Leonard had testified during an earlier deposition that the decision to demote Goza was made in concert with Goodloe and Bieber and that Collins preferred that Goza be terminated.  (Dep. of Virginia Leonard, ECF No. 39-4 at PageID 232; see Testimony of Virginia Leonard, ECF No. 114 at PageID 1720.)  At trial, Leonard testified that Goodloe, Bieber, and Collins all "signed off" on the decision to demote. (Testimony of Virginia Leonard, ECF No. 114 at 1721.)

In addition to Leonard's deposition testimony, the Court heard other evidence that Collins ratified the decision to demote and terminate Goza.  During Leonard's August 21, 2017 investigatory hearing with Goza, Union Representative Patrick Epps asked why Goza was being treated differently than a past employee: "The reason why I guess I question this… 7, 8 years ago I was in a similar hearing with David Hoxsey (phonetic) who had questions brought up about him celebrating the sons of confederate veterans."  (Hearing Transcript, Trial Exhibit 9 at 20; Hearing Recording, Trial Exhibit 8.)  Leonard responded, "What we didn't have in David Hoxsey's day was this level of social media. We didn't have this level of interactions with people in the public that have already taken their concerns to Jerry Collins and to the Mayor." (Id. at 21.)  After receiving complaints from the public, Collins instructed Goodloe to investigate

Goza's protest and Facebook activity.  (Trial Exhibit 44.)  On September 7, 2017, Collins emailed Leonard, Goodloe, and Bieber to say that he "would rather [Goza] be in contact with contractors than customers."  (Emails, Trial Exhibit 31.)  MLGW offered Goza the choice of working as a Material Handler or being terminated the next day.  (Pretrial O., ECF No. 98 at PageID 1506.)

Together, the evidence preponderates in favor of a finding that Collins suggested and then ratified the decision to demote and terminate Goza.  Collins knew about the initial complaints about Goza, which caused him to order Goodloe to conduct an investigation.  (Trial Exhibit 44.)  Leonard stated that she treated Goza differently in part because Collins was aware of Goza's conduct.  (Trial Exhibit 9 at 20.)  Collins provided his opinion as to the proper consequences for Goza's conduct on the last day of the decision-making process.  (Trial Exhibit 31.)  Collins was involved at the inception of the investigation and its conclusion.  The decision to demote and discharge Goza was affirmatively approved and ratified by Collins; it was therefore MLGW's policy.  See Arnold, 515 F. App'x at 538; Feliciano, 988 F.2d at 656; Praprotnik, 485 U.S. at 130.

## III.    First Amendment

### A.  General Substantive Law

"[R]etaliation under color of law for the exercise of First Amendment rights is unconstitutional…"  Zilich v. Longo, 34 F.3d 359, 365 (6th Cir.1994), cert. denied, 514 U.S. 1036 (1995).  "[P]ublic employers may not condition employment on the relinquishment of constitutional rights."  Lane v. Franks, 134 S. Ct. 2369, 2377 (2014); see also Holbrook v. Dumas, 658 Fed. Appx. 280, 282-83 (6th Cir. 2016).  A public employee may therefore bring a

First Amendment retaliation claim under 42 U.S.C. § 1983.  See, e.g., Valot v. Southeast Local Sch. Dist. Bd. of Educ., 107 F.3d 1220, 1226 (6th Cir. 1997), cert. denied, 522 U.S. 861 (1997).

A claim of free speech retaliation by a public employer under § 1983 requires proof of three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct."  Bickerstaff v. Lucarelli, 830 F.3d 388, 399 (6th Cir. 2016) (alteration omitted).  The first two elements are "threshold" questions which, if answered in the affirmative, lead to the third.  Miller v. City of Canton, 319 Fed. Appx. 411, 416 (6th Cir. 2009).

The third element of a § 1983 First Amendment retaliation claim requires the plaintiff to "demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action."  Rodgers v. Banks, 344 F.3d 587, 602 (6th Cir. 2003).  To do so, the plaintiff "must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse action] would not have occurred but for [the plaintiff's] engagement in protected activity."  See Eckerman v. Tennessee Dep't of Safety, 636 F.3d 202, 209 (6th Cir. 2010).  The plaintiff "must point to specific, nonconclusory allegations reasonably linking her speech to employer discipline."  Rodgers, 344 F.3d at 602 (quoting Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler, 106 F.3d 135, 144 (6th Cir. 1997)).

## B.  Goza Spoke as a Private Citizen on Matters of Public Concern

The Court begins by considering whether Goza engaged in constitutionally protected speech.  Bickerstaff, 830 F.3d at 399.  To show "that his speech was constitutionally protected, a public employee must show (1) that he was speaking as a private citizen, rather than pursuant

to his official duties; (2) that his speech involved a matter of public concern; and, (3) if so, that his interest as a citizen in commenting on the matter outweighed the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Westmoreland v. Sutherland, 662 F.3d 714, 718–19 (6th Cir. 2011) (internal citations and quotation marks omitted) (numerals added).

Goza attended the August 15, 2017 Jefferson Davis protest on his day off, so his statements at the rally were made as a private citizen. (Testimony of Michael Goza, ECF No. 116 at PageID 2149.) MLGW introduced no evidence to suggest that Goza made his Facebook posts while at work. Goza's Facebook profile did include a picture of him and his daughter in an MLGW truck, but this picture does not establish his Facebook statements were made "pursuant to official duties." Miller v. City of Canton, 319 F. App'x at 417 (explaining that speech is "pursuant to official duties" if making such statements is what the individual is "employed to do"). (Trial Exhibit 1.) While Goza's statements on Facebook may have been offensive, he expressed opinions on matters of public concern, including race, abortion, federal policy, and monuments to Confederate leaders. See Connick v. Myers, 461 U.S. 138, 146 (1983); Rankin v. McPherson, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.") The Court finds that Goza was speaking as a private citizen and on matters of public concern.

## C.  Balancing Interests of Goza and MLGW

The Court turns to the third aspect of the protected speech inquiry, in which the Court must balance the employee's rights and the employer's interest in the efficiency of public

services.  Miller v. City of Canton, 319 F. App'x at 417 (applying Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  "In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers."  Meyers v. City of Cincinnati, 934 F.2d 726, 730 (6th Cir. 1991).  "The government must make a particularly strong showing where the speech substantially involves matters of public concern."  Miller v. City of Canton, 319 F. App'x at 417 (internal quotation marks and alterations omitted).

"[A] public employer need not show actual disruption of the public agency in all cases in order to prevail under the Pickering balancing test.  Instead, when the employer does not offer such evidence, we must assess whether the employer could reasonably predict that the employee speech would cause disruption in light of the manner, time and place the speech was uttered, as well as the context in which the dispute arose."  Gillis v. Miller, 845 F.3d 677, 687 (6th Cir. 2017) (internal quotation marks and citations omitted).  Speculative concerns or conclusory assessments are insufficient to outweigh a Plaintiff's First Amendment rights.  Id.; Whitney v. City of Milan, 677 F.3d 292, 298 (6th Cir. 2012); Miller v. City of Canton, 319 F. App'x at 418.

### D.  MLGW Terminated Goza to Avoid Controversy

MLGW argues that several reasons motivated its decision to discipline Goza, including potential liability, Goza's safety, public safety, and Goza's ability to perform work in or near customer homes.  (ECF No. 112 at PageID 1605.)  Leonard testified that she considered these

factors as she made her decisions, but the Court did not find that portion of her testimony credible. (ECF No. 114 at PageID 1756-60.) Leonard testified that she chose to indefinitely suspend Goza in order to gather additional relevant information. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1835.) Leonard did not, however, conduct any interviews with coworkers, supervisors or character references to assess the likelihood that Goza would discriminate against African-American customers. (Id. at PageID 1722-23.) Leonard also did not interview any customers who submitted complaints to determine whether they would boycott MLGW or would bar Goza from working in their homes. (Id. at PageID 1723.) Leonard had admitted in a previous deposition that there was no evidence that Goza was in danger. (See Id. at PageID 1757.)

Instead, Leonard's investigation was limited to finding the news footage and *The Commercial Appeal* article that featured Goza and to contacting Goza's Manager, Mike Page, to determine Goza's contemporary statements about the press coverage. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1835-41; see Trial Exhibit 28.) The Court finds Leonard's contemporary statements to be strong evidence of MLGW's motivation. As stated more fully above, when Leonard was asked at a disciplinary hearing why Goza and David Hoxsey were treated differently, Leonard responded, "What we didn't have in David Hoxsey's day was this level of social media. We didn't have this level of interactions with people in the public that have already taken their concerns to Jerry Collins and to the Mayor." (Hearing Transcript, Trial Exhibit 9 at 21.) Christopher Bieber, who "signed off" on the decision to discipline Goza, answered in the affirmative when asked, "You felt that it would look bad to the politicians and the newspapers if that came out because someone holding those beliefs was allowed to continue to work at MLG&W." (Testimony of Christopher Bieber, ECF No. 116 at PageID 2034.) After

considering the scope of Leonard's investigation, Leonard's demeanor at trial, Leonard's statements, and Christopher Bieber's testimony, the Court finds that the demotion and termination in this case were not actually motivated by liability, safety, or operational concerns. (See ECF No. 112 at PageID 1605.)

MLGW also reacted more leniently to similarly inflammatory speech by a different employee, which further demonstrates that MLGW did not genuinely believe that Goza's statements represented a threat of violence. In a Facebook live video, an MLGW Maintenance Helper named Deandre Stewart stated that "We need to boycott stores run by Asians, these Chinese stores… We can… start killing these motherfuckers too… [P]eople gonna have to die behind this shit." (Trial Exhibit 19 at 7.) "We need to boycott all these Arabs… All these Arab punk stores, I ain't seen not one motherfucking Arab march. I ain't seen not one Asian march… Go to them Chinese ladies and say, why the fuck y'all ugly ass bitch didn't come to the rally for… they take y'all money and they send that shit overseas to they ugly ass kids. They ugly ass kids come over here and go to these motherfucking school and shit off your dime." (Id. at 17-18.) On his Facebook account, Stewart wrote, "Like I said before child molestors [sic] and gays run hand to hand." On August 12, 2017, Stewart wrote "LOL" in regard to an article covering that day's events at Charlottesville, Virginia: "A hospital official confirmed one person died and 19 were injured after a car plowed into protestors." (Trial Ex. 21).

Leonard knew about Stewart's comments while she was investigating Goza, but neither she nor anyone else at MLGW took any steps to examine Stewart's statements until July of 2018. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1763; Trial Exhibit 45.) MLGW eventually concluded that Stewart could return to work and to potential customer contact after a three-day suspension. (Trial Exhibit 40; Testimony of Deandre Stewart, ECF

No. 116 at PageID 1971.)  Leonard testified that Goza's speech disqualified him from Stewart's position because Maintenance Helpers had the potential for customer contact.  (Testimony of Virginia Leonard, ECF No. 114 at PageID 1840-41.)  MLGW's actions demonstrate, however, that it did not believe that Stewart would treat Arab, Asian, or homosexual customers unfairly. MLGW similarly did not believe that Stewart was dangerous even though he said "We can… start killing these motherfuckers too" in reference to Asian-Americans.  (Trial Exhibit 19 at 7.) The Court finds that MLGW did not actually believe that social media comments like Goza's were reasonable indications of future violent or racist actions.

The Court finds that MLGW took action against Goza because his statements "threaten[ed] the Division's bonds with the public it serves" and because it believed that "had MLGW allowed Mr. Goza to remain in a customer contact position, the public at large would have viewed MLGW's decision as an endorsement of Mr. Goza's racist and violence-promoting views."  (Id. at PageID 1603.)

1.  Concerns about public perception are not Constitutionally permissible in this case

A concern about MLGW's brand or reputation is not sufficient to outweigh Goza's rights.  Voters cannot use the ballot box to make the government silence their opponents; the public cannot use social media to do so either.  The idea that the government should be permitted to censor speech in order to avoid public outcry was raised and dismissed in the Civil Rights era.  Brown v. State of La., 383 U.S. 131, 133 n. 1 (1966) ("Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence."); Boa Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F.2d 212,

214 (4th Cir. 1945) (striking down a public library's policy against hiring African-American employees, where said policy was enacted "in view of the public criticism which would arise" if African-Americans were hired). The Second Circuit recently explained this rationale in a different area of law:

> [T]he possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily… lawful motivations distinct from sex bias. A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action.

Doe v. Columbia Univ., 831 F.3d 46, 58 n. 11 (2d Cir. 2016).

The rise of social media presents these issues in an unfamiliar context. The Court understands that government officials may soon have to weigh the free-speech interests of their employees against a tsunami of public uproar. See Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee, No. 3:17-CV-00630, 2019 WL 1572932, at *1 (M.D. Tenn. Apr. 11, 2019) (ruling on motions for summary judgment involving government employee's use of racial slur on social media); see also Watt Lesley Black, Jr., When Teachers Go Viral: Balancing Institutional Efficacy Against the First Amendment Rights of Public Educators in the Age of Facebook, 82 Mo. L. Rev. 51, 51-52, 67-80 (2017) (collecting and summarizing cases that involve firings of government employees for social media speech). Notwithstanding these difficulties, MLGW's response in this case was the wrong one.

The fear of "going viral," by itself, does not appear to be a reasonable justification for a restriction on an employee's speech. To hold otherwise would permit the government to censor certain viewpoints based on the whims of the public – or, worse, based on a government official's speculation as to the public's eventual reaction. See George S. Scoville III, Purged

by Press Release: First Responders, Free Speech, and Public Employment Retaliation in the Digital Age, 97 Or. L. Rev. 477, 528 (2019) (positing that a "gap in free-speech jurisprudence" that has not yet fully adapted to the social media age "incentivizes municipal employers to … punish employees on the basis of the content of their speech… or censor a particular viewpoint.") "The advent of social media does not… provide a pretext for shutting off meaningful discussion of larger public issues in this new public sphere." Liverman v. City of Petersburg, 844 F.3d 400, 414 (4th Cir. 2016).

## 2. Even if permitted under the Constitution, public perception concerns were too speculative

MLGW argues that if it did not take action against Goza, "[t]he ramifications would be disruptive in terms of MLGW providing services to a predominantly African-American community." (ECF No. 112 at PageID 1603.) MLGW did not, however, produce evidence to show that Goza's continued employment would disrupt MLGW in providing services to African-Americans or to Memphis generally. Goza worked for four days without incident after the protest. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1758.) The proof showed that MLGW received ten complaints, the last of which was received on August 29, 2017. Although MLGW argues that the end of the complaints may be evidence that the public supported Goza's suspension on August 21, 2017, there is no evidence that the public learned about this discipline in the first place. (See ECF No. 112 at PageID 1607, n. 11.) The evidence does not support a finding that MLGW reasonably feared that Goza's continued employment would have adversely affected the MLGW brand or the ability of Tech III's generally to do their jobs.

### E.  Even if Genuinely Believed, MLGW's Other Stated Motivations would be Unreasonable

As stated above, the Court finds that MLGW demoted and terminated Goza because he voiced controversial opinions and that MLGW did not actually believe that Goza's continued employment posed a threat to public safety.  The Court also finds, as explained below, that even if these other reasons did motivate MLGW, they were too speculative to pass Constitutional muster.

#### 1. Threat of violence or discrimination by Goza was speculative

At trial, MLGW advanced the theory that Goza's speech led MLGW to reasonably predict that Goza might pose a threat to members of the public.  Evidence was introduced that an individual identified as Mike Cross made the following Facebook comment:

> As for Charlottesville what's not being emphasized is why the White Nationalists came prepared to fight. In fact, they came prepared to defend themselves as a result of what happened in NOLA. In NOLA the pro Confederate legacy supporters came unarmed in street clothes and got the hell beat out of them by BLM, Antifa and their ilk Charlottesville, however was going to be different This time the "good guys" were ready to defend themselves- and they did! And that's what's giving Leftists heartburn They can't stand it when God-fearing patriots stand up to them [] and win! When the good guys get fed up and truly truly organize there is nothing patriots can't accomplish…

Goza responded: "Amen Brother."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 45-1 at 589; see Testimony of Michael Goza, ECF No. 116 at PageID 2178-79.)  Cross's comment apparently referred to a series of protests in Charlottesville, Virginia on August 11 and 12, 2017, during which a woman was killed by a white supremacist.  (Testimony of Michael Goza, ECF No. 116 at PageID 2179.)  See Statement of Offense, United States v. James Alex Fields, 3:18-CR-00011 at ECF No. 44 (W.D. Va. 2019) (describing murder committed by criminal defendant at Charlottesville protests).  At trial, MLGW advanced the theory that Goza's "Amen" therefore represented an endorsement of politically-motivated violence.

23

Goza's "Amen Brother," by itself, does not send a clear message. The Court cannot determine from this statement whether Goza agreed to all, most, or part of Cross's comment. Furthermore, the evidence does not show that Goza knew that a woman had been killed in Charlottesville when he wrote his response. (See Trial Exhibit 9 at 12 (expressing then-existing mental state that "I don't know what really happened" in Charlottesville).) Goza told Leonard that he did not condone violence and referred to his employment history as proof during the August 21, 2017 meeting. (Id.) This put Leonard on notice to conduct further investigation before deciding to remove Goza from customer contact.

MLGW could not have reasonably predicted that Goza was violent from his single "Amen Brother" comment against the backdrop of his history at the Division. Goza had received favorable reviews throughout his time at MLGW and had never received a complaint alleging violent behavior or racial animus on the job. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1734-35, 1759; Goza Personnel File, Trial Exhibit 16.) Lacking a definitive basis for an interpretation of the comment itself, and after considering Goza's employment history, the Court finds that MLGW's prediction that Goza was dangerous was unreasonable.

2. Threat of violence to Goza was speculative

MLGW also claims that it terminated Goza because his speech put his safety at risk. (ECF No. 112 at PageID 1604-1605.) Again, the evidence showed that public complaints about Goza subsided by August 29, 2017. Furthermore, Goza worked without incident for four days after his comments were reported in *The Commercial Appeal*. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1758.) As stated above, MLGW Vice President Chris Bieber, who "signed off" on the decision to demote Goza, testified that Goza's safety was not a factor in

MLGW's decisions. (See Dep. of Christopher Bieber, ECF No. 45-4 at PageID 716.) MLGW argues that the fact that Goza left Memphis constitutes evidence that Goza really was in danger. (ECF No. 112 at PageID 1605 n.9.) Goza testified, however, that he left Memphis to reduce his cost of living in the wake of his discharge. (ECF No. 116 at PageID 2166.) The evidence shows that MLGW's concerns for Goza's safety were speculative and, therefore, did not outweigh his First Amendment rights.

### 3. Threat of liability was speculative

MLGW claims that it "evaluated… liability if an 'accident' were to occur at a home or establishment serviced by Goza." (ECF No. 112 at PageID 1604.) As stated more fully above, the evidence shows that Goza was unlikely to have harmed anyone or to have treated any customer differently because of their race. MLGW argues that even if Goza were blameless in an accident, however, "his motives in the event of an 'accident' would forever be called into question." (ECF No. 112 at PageId 1604 n.8.)

The proof at trial, however, revealed that accidents attributable to Tech III's are rare, only occurring once or twice in the last ten years. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1758.) MLGW's concern that an accident would occur at a home that Goza had recently serviced, that said accident would result in a trial, and that Goza's comments on Facebook would make the difference between a finding of liability and a finding of no liability is too speculative too outweigh Goza's rights. MLGW's late assertion that "common sense suggests there are many other types of mistakes that could occur" is undeveloped in the record and unpersuasive to the Court. (See ECF No. 112 at PageID 1604 n.8.)

### 4. MLGW's cited cases are distinguishable in key ways

MLGW states that this issue is arguably one of first impression and directs the Court to a number of cases from other parts of the country. (ECF No. 112 at PageID 1605.) As a preliminary matter, the Court notes that these cases appear correct but are inapplicable here. Each involves an individual responsible with duties more serious than Goza's, including responsibility over life-and-death decisions, supervision of entire City departments, and the setting of City policy. The Court's Opinion should not be understood as disagreeing with these cases or as holding that offensive speech by public employees is always protected; the Memphis Police Department, for example, would likely be acting constitutionally if it disciplined an officer who used a racial slur on the job. See Petitt v. City of Cleveland, No. 1:18-CV-1678, 2019 WL 1558741 (N.D. Ohio Apr. 10, 2019); accord Duke v. Hamil, 997 F. Supp. 2d 1291, 1301 (N.D. Ga. 2014) (finding that municipality did not violate the First Amendment rights of a police officer who posted a picture of the Confederate flag on Facebook with the caption "It's time for the second revolution" when it fired him, because of the "unique needs of police departments.")

MLGW relies on Cochran v. City of Atlanta, Georgia, 289 F. Supp. 3d 1276 (N.D. Ga. 2017). (ECF No. 112 at PageID 1605.) In Cochran, the court considered the termination of a Fire Chief who wrote a book that "includes passages indicating… that sex outside of the confines of marriage between a man and woman—including fornication, homosexual acts, and all other types of non-marital sex—is contrary to God's will." Id. at 1282. "The book also categorizes the following as equally 'unclean'—or 'whatever is the opposite of purity': 'sodomy, homosexuality, lesbianism, pederasty, bestiality, and all other forms of sexual perversion.'" Id. "In the 'About the Author' section of the book, Plaintiff [Cochran] states that

he is 'currently serving as the Fire Chief of the City of Atlanta Fire Rescue Department (GA).'" Id. at 1283.

The Cochran court ruled that the termination was not a violation of the First Amendment, but Cochran reflects a substantially different set of circumstances than those at issue here. See generally 289 F. Supp. 3d at 1290-93. Cochran gave unsolicited copies of his book to subordinates. Id. at 1283. The court specifically found Cochran's role as head of a department, the life-and-death nature of firefighting, and Cochran's "opinion that the death of all individuals who engage in homosexual and extramarital sex would be celebrated" caused the City of Atlanta to reasonably predict that Cochran's speech would cause workplace discord. Id. at 1290. The court also found that Cochran's employment resulted in actual disruption of the Fire Department's mission, in that Cochran had accepted the support of a social media campaign that resulted in death threats to Atlanta's mayor and "thousands of emails, both for and against Plaintiff's suspension." Id. at 1291.

Goza's comments were not made at work, and MLGW has not produced testimony by supervisors or coworkers as to any actual disruptive effect of Goza's statements. Goza was not in a managerial role, let alone one as the head of an agency charged with maintaining public safety. Goza's work as a Tech III does not involve the same life-and-death risks as firefighting. The social media complaints in this case were far less extensive than the complaints in Cochran. Although the Cochran case contains thoughtful consideration of difficult issues, its relevance in this case is limited.

MLGW also cites Snipes v. Volusia County, 2017 WL 3588273 (11th Cir. Aug. 21, 2017) (per curiam). In Snipes, the Eleventh Circuit considered the termination of a law

enforcement officer who made several racially insensitive comments on his Facebook page and in group text messages. The Eleventh Circuit stated, "if the County had not terminated [the plaintiff] it was reasonably possible that there would have been substantial protests and rallies in the community, that the Beach Patrol's ability to recruit new members from the African-American community would have been hindered, and that the public's confidence in the Beach Patrol – and perhaps all County law enforcement – would have been adversely affected." Id. at *4. The Court does not find Snipes to be persuasive because, as stated above, the proof in this case does not show a likelihood of disruption. Accord Hamil, 997 F. Supp. 2d at 1301 (holding that "unique needs of police departments" justify greater restrictions of speech by employees).

Lumpkin v. Brown, 109 F.3d 1498, 1500 (9th Cir. 1997), is also unpersuasive. (See ECF No. 112 at PageID 1604.) In that case, a minister was removed from San Francisco's Human Rights Commission because he stated that the "homosexual lifestyle is an abomination against God" and that he believed that "a man who sleeps with a man should be put to death." Lumpkin, 109 F.3d at 1499. The Ninth Circuit found that the minister's termination was permissible, stating that the First Amendment "does not assure him job security when he preaches homophobia while serving as a City official charged with the responsibility of eliminating prejudice and discrimination" as a member of the Human Rights Commission. Id. at 1500 (internal quotation marks omitted). Goza's position as a Tech III did not involve setting anti-discrimination policy, nor does the evidence support a finding that his continued employment would undermine MLGW's operations.

### F. MLGW Took an Adverse Action Motivated by Goza's Speech

Having determined under the three-part test that Goza's speech was protected, Westmoreland, 662 F.3d at 718–19, the Court now considers the remaining two elements of a First Amendment claim, namely whether Goza suffered an "adverse action" "that would deter a person of ordinary firmness." Bickerstaff, 830 F.3d at 399. The parties do not dispute that these elements are satisfied in this case. (See generally ECF Nos. 107, 112.) The proof at trial showed that this demotion would have resulted in a significant pay decrease. (Testimony of Michael Goza, ECF No. 116 at PageID 2165.) The Court finds that such a decrease would deter an ordinary person. The parties also do not dispute that "the adverse action was motivated at least in part" by Goza's speech. Bickerstaff, 830 F.3d at 399. MLGW explicitly said as much when it submitted Goza's Discharge Form. (Discharge Form, Trial Exhibit 14 at 5; see generally ECF Nos. 107, 112.)

### G. Free Speech Conclusion

For the reasons set forth above, the Court finds that MLGW violated Goza's right to free speech when it demoted and terminated him. Specifically, the Court finds that Goza's speech was protected because it was made outside of work on topics of public concern and because MLGW's concerns were speculative or unconstitutional. The Court further finds that Goza was demoted and then terminated because of his speech, and that such actions by MLGW constitute adverse actions that would deter a person of ordinary firmness.

## IV.	Discrimination

### A.  General Substantive Law

42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcing of contracts.  "Section 1981 claims are analyzed under the Title VII McDonnell Douglas/Burdine framework."  Newman v. Fed. Exp. Corp., 266 F.3d 401, 406 (6th Cir. 2001).  To establish a prima facie discrimination claim, a plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class or treated differently from similarly-situated members of an unprotected class.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  "The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination." Leadbetter v. Gilley, 385 F.3d 683, 690 (6th Cir. 2004).  "In such cases, a plaintiff satisfies the first prong of the prima facie case by demonstrating background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id.  (internal citations and quotation marks omitted).  "In our view, the 'reverse discrimination' complainant bears the burden of demonstrating that he was intentionally discriminated against 'despite his majority status.'"  Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985)

"To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class."  Leadbetter, 385 F.3d at 690 (internal citations and quotation marks omitted).  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;'

rather… the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir.1998) (internal citation and quotation marks omitted). "Courts… should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." <u>Ercegovich</u>, 154 F.3d at 352; <u>see also</u> <u>Jackson v. FedEx Corp. Servs., Inc.</u>, 518 F.3d 388, 396 (6th Cir. 2008) (cautioning against an "exceedingly narrow" formulation of the similarly situated standard and requiring a "true independent determination of the relevant factors"). In a reverse discrimination case, the first and fourth prongs should be viewed separately. "Showing that similarly situated employees of other races were treated differently than the plaintiff is an independent evidentiary requirement… holding that such evidence also satisfies the background circumstances requirement would collapse a four-legged test into a three-legged one." <u>Treadwell v. Am. Airlines, Inc.</u>, 447 F. App'x 676, 679 (6th Cir. 2011).

If a plaintiff makes a prima facie case, the burden of production, but not of persuasion, then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 142-43 (2000). The plaintiff must demonstrate that the defendant's proffered reason was a pretext for discrimination. <u>Id.</u> at 143. A plaintiff may establish pretext by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." <u>Imwalle v. Reliance Med. Prods., Inc.</u>, 515 F.3d 531, 545 (6th Cir. 2008). "[A] reason cannot be proved to be 'a pretext for discrimination'

unless it is shown both that the reason was false, and that discrimination was the real reason."

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

## B. Background Circumstances

The Court first considers whether Goza has shown "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." Leadbetter, 385 F.3d at 690. MLGW's statements showed that MLGW considered Goza's race when it acted. Leonard filled out a discharge form, in which she stated that "the [August 15, 2017] rally was in support of removing [statues] that are deemed offensive to the [A]frican [A]merican population as they are confederate generals. Mr. Goza made references to protecting his heritage as a white male." (Discharge Form, Trial Exhibit 14 at 5.) Leonard previously testified that she acted because Goza's statements "were inflammatory to the African-American community at that time." (Dep. of Virginia Leonard, ECF No. 41-3 at 378.) At trial, Leonard testified that this was one of the factors that influenced the decision to terminate Goza. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1730.)

Leonard testified during a deposition that Vice President of Corporate Communications Gale Carson, an African-American woman, was a source of information for her investigation and voiced the opinion that Goza should be terminated. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1716; Trial Exhibits 42, 43.) On August 18, 2017, Carson informed Jerry Collins, Christopher Bieber, Von Goodloe, and others that she "strongly disagree[d]" with Goza working in "African-American neighborhoods" and recommended that he be removed from customer contact. (Trial Exhibit 43.) The Court finds that Carson's seniority, her role in providing information to Leonard, and her "strong" opinion before the investigation began all

support the conclusion that Carson exerted discriminatory influence on MLGW's decision. (Id.) See Zambetti v. Cuyahoga Cmty. College, 314 F.3d 249, 257 (6th Cir. 2002). Upon consideration of Carson's role and Leonard's explicit statement that offense to "the African American population" and Goza's references to "his heritage as a white male" were considered in her decision making, the Court finds sufficient "background circumstances" in this case to satisfy the first prong of a prima facie case of discrimination. Leadbetter, 385 F.3d at 690.

### C. Similarly Situated Comparator

MLGW does not dispute that Goza suffered an adverse employment action or that Goza was qualified to work as a Tech III. (See ECF No. 112 at PageID 1608-10.) The Court therefore turns to the consideration of similarly-situated but differently-treated comparators, the fourth element of a prima facie case of discrimination. Leadbetter, 385 F.3d at 690. "The plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." Ercegovich, 154 F.3d at 352. (internal citation and quotation marks omitted). "Courts… should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Ercegovich, 154 F.3d at 352; see also Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 396 (6th Cir. 2008) (cautioning against an "exceedingly narrow" formulation of the similarly situated standard and requiring a "true independent determination of the relevant factors").

Goza argues that he is similarly situated to Deandre Stewart, an African-American Maintenance Helper for MLGW. (ECF No. 107 at PageID 1572.) As explained above, Deandre Stewart made comments on Facebook including: "We need to boycott stores run by Asians, these Chinese stores… We can… start killing these motherfuckers too," (Trial Exhibit 19 at 7)

and "Like I said before child molestors [sic] and gays run hand to hand." (Trial Exhibit 21.) Stewart was disciplined with a three-day suspension for these statements. (Trial Exhibit 40.)

MLGW responds that Stewart is not similar to Goza in all relevant aspects. (ECF No. 112 at PageID 1612.) First, MLGW argues that "Stewart is not subject to the standards in the Customer Service Handbook" and never "worked alone and went into customer homes as a part of his job." (Id.) MLGW did not consider demoting Goza to Stewart's position, however, because MLGW found that Goza's statements made him ineligible for even that level of customer contact. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1718-19.) The Court finds that this distinction is therefore not relevant to the discipline imposed by MLGW in this case.

MLGW also argues that Stewart was not similarly situated because his Facebook page did not clearly display his employment with MLGW. (ECF No. 112 at PageID 1612.) The Court finds this argument is unsupported by the evidence. Goza's Facebook profile included a picture of him and a child in an MLGW truck, but the photo was posted on March 7, 2014 and does not present a clear view of Goza's face. (Trial Exhibit 2.) Deandre Stewart, on the other hand, has several photos from 2016 showing him at work, one of which includes an MLGW truck in the background. (Trial Exhibit 20.) The Court finds that Goza and Stewart are sufficiently similar in how closely their Facebook profiles associated them with MLGW.

MLGW claims that Stewart and Goza are not similarly situated because Stewart was not the subject of public complaints. (ECF No. 112 at PageID 1612-13.) As the Court noted in its Order on Summary Judgment, (ECF No. 92), members of the public may have a predisposition on the issue of race. If the public were to make complaints on the basis of race, the subjects of

those complaints would almost never be able to find a similarly situated comparator. This would effectively allow an employer to rubber-stamp the racial prejudices of members of the public, which cannot be an effective application of § 1981. See Doe v. Columbia Univ., 831 F.3d at 58 n. 11. The Court finds that public complaints are not necessary for Stewart to be similarly situated to Goza in this case. Instead, the Court finds that Deandre Stewart is similar to Goza in that his statements were visible to the public and, if read, could affect MLGW's reputation.

Goza has proven that he was treated differently than Stewart even though both employees were similar in all relevant aspects. Goza has therefore satisfied all four elements of a prima facie case of discrimination. The Court next considers whether MLGW's proffered reasons for demoting and discharging him were a pretext for discrimination. Reeves, 530 U.S. at 142-43.

### D. Pretext

If a plaintiff makes a prima facie case, the burden of production, but not of persuasion, then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142-43 (2000). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). MLGW states that it disciplined Goza because he violated MLGW policy. (See ECF No. 112 at PageID 1614.) Specifically, MLGW claims that Goza violated "MLGW Human Resources Policy Manual, Policy #23-12 'Anti-Harassment,['] MLGW Human Resources Policy Manual, Policy #23-15 'Standards of Business Conduct,' Civility in the Workplace, Labor Relations Bulletin #87, Fostering Respectful Work Environment, Labor Relations Bulletin #104,

and… the Customer Service Field Operations Handbook." (Pl.'s Resp. Def.'s Material Facts, ECF No. 45-1 at 597-98; see Testimony of Virginia Leonard, ECF No. 114 at PageID 1726, 1728; see also Trial Exhibit 14.) MLGW does not claim that Goza violated a social media policy, and Von Goodloe conceded that MLGW did not have such a policy during the relevant time or at the time of trial. (See Testimony of Von Goodloe, ECF No. 116 at PageID 2043).)

The actions of MLGW in connection with this case show that Goza was fired at least in part because of his race and not for violation of MLGW policy. Employee Services and Talent Acquisition Manager Eric Conway issued a report comparing Stewart and Goza. (Trial Exhibit 45.) Conway testified that he prepared his report using only those materials which were provided to him by Hewlett. (ECF No. 116 at PageID 2086.) Vice President of Human Resource Von Goodloe testified that he had never seen MLGW perform a comparative analysis of the conduct of different employees. (Testimony of Von Goodloe, ECF No. 116 at PageID 2053-54.) Based on Conway's demeanor and his response to questions on direct examination, the Court did not find credible Conway's testimony that he reviewed Deandre Stewart's social media posting but did not believe that Stewart's statements demonstrated genuine racial animus or represented a serious violation of MLGW policy. (ECF No. 116 at PageID 2093, 2097.)

The Court finds that the report materially and repeatedly misrepresented Stewart's Facebook statements. (Compare Trial Exhibit 45 with Trial Exhibits 20, 21; Testimony of Eric Conway, ECF No. 116 at PageID 2092-93.) The Court further finds that MLGW drafted this report to exonerate Stewart, rather than to provide a fair and honest assessment of his actions. To summarize, MLGW took the unusual step of directing a subordinate to draft a misleading document in order to undermine the fair application of MLGW policies. Such an action reveals

that the offered non-discriminatory reasons cited to justify firing Goza were not genuinely held by MLGW.

In its Motion for Summary Judgment, MLGW also argued that Goza was actually terminated based on a "reasonable prediction that Goza's racist Facebook posts would interfere with its operations, create safety issues, and violate the trust MLGW shares with its customers for equal service regardless of race." (Def.'s Mem. Supp. Mot. Summ. J. ECF No. 41-1 at 338-39; Def.'s Reply Supp. Mot. Summ. J., ECF No. 54 at 896-97.) As stated more fully above, the Court has found that these reasons were not genuinely held by MLGW at the time it decided to terminate Goza. The Court finds that these reasons were "not the actual reason for the termination." Imwalle, 515 F.3d at 545.

The Court also finds that discrimination was the real reason for Goza's demotion and termination. As stated above, Virginia Leonard explicitly identified "offensiveness to the African American community" and Goza's understanding of his "white heritage" as the reasons for firing him. (Testimony of Virginia Leonard, ECF No. 114 at PageID 1730.) At trial, Goza proved that MLGW treated him differently because of his race. St. Mary's Honor Ctr., 509 U.S. 502, 515 (1993).

## V.    Motion to Amend the Pleadings

At the conclusion of trial, Goza moved to amend the pleadings to conform with the evidence under Federal Rule of Civil Procedure 15(b). Goza specifically asks the Court to consider the issue of whether MLGW retaliated against Goza for bringing this lawsuit when it stayed his grievance mediation process. (ECF No. 104 at PageID 1531-32.) "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated

in all respects as if raised in the pleadings." Fed. R. Civ. Pro. 15(b). "[T]he Rules put forth a liberal policy of permitting amendments in order to ensure determination of claims on their merits." Ale v. TVA, 269 F.3d 680, 693 (6th Cir. 2001). "To establish implied consent in the context of Rule 15(b), it must appear that the parties understood the evidence to be aimed at the unpleaded issue." Sasse v. United States Dep't of Labor, 409 F.3d 773, 781 (6th Cir. 2005) (citations and internal quotation marks omitted).

Goza argues that MLGW introduced the issue of retaliation through its examination of Collins and Angela Hewlett. (ECF No. 104 at PageID 1533.) The Court finds, however, that MLGW did not understand the evidence to be aimed at the unpleaded issue. Sasse, 409 F.3d at 781. Instead, MLGW was attempting to introduce evidence as to the final policymaker for employment decisions at the Division. Although the Court was not permitted to consider such evidence on that question, Praprotnik, 485 U.S. at 126, the Court finds that this testimony was not aimed at the issue of retaliation. Sasse, 409 F.3d at 781. The Motion to Amend is DENIED.

## VI. Relief

The Court finds, and the parties do not dispute, that if successful Goza is entitled to reinstatement as a Customer Service Tech III at MLGW. (See Pretrial O., ECF No. 98 at PageID 1507.) Accordingly, MLGW is ORDERED to reinstate Goza. The parties also agree that "Goza has incurred $132,973.19 in backpay plus lost fringe benefits in the amount of $26,853.71" from August 2017 to the start of trial. (Id. at 1525.) Accordingly, judgment shall be entered for Goza and against MLGW in the amount of $159,826.90, representing $132,973.19 in backpay plus lost fringe benefits in the amount of $26,853.71.

In addition to reinstatement, Mr. Goza seeks compensatory damages for emotional distress in an amount to be determined by the Court. At trial, Goza testified that loss of employment caused significant emotional and psychological distress. The Court finds that Goza is entitled to an award of $30,000 in compensatory damages.

"If the Court were to find in Mr. Goza's favor, the parties reserve the calculation of… additional backpay damages as well as pre-judgment interest until after the entry of judgment in Mr. Goza's favor." (Id.) Given the judicial policy against piecemeal judgments, the parties are ORDERED to confer and submit a joint proposal by Friday, June 21, 2019 as to the proper amount of backpay, as well as prejudgment interest, through Monday, June 24, 2019.

**SO ORDERED**, this 14th day of June, 2019.

 /s/ Jon McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE